MODERN SOUNDS & SYSTEMS, INC., A CORPORATION, ET AL., APPELLANTS, V. FEDERATED MUTUAL INSURANCE COMPANY, A CORPORATION, APPELLEE.

262 N. W. 2d 183

Filed February 8, 1978. No. 41178.

Wright & Simmons, for appellants.

Holtorf, Hansen, Kovarik & Nuttleman, Byron J. Brogan, and James W. Ellison, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

McCown, J.

The corporate plaintiff, Modern Sounds & Systems, Inc., and its president, Roy John Reid, brought this action to recover for the theft of an automobile owned by Reid and insured under an insurance policy issued by the defendant, Federated Mutual Insurance Company. The case was tried to the District Court sitting without a jury. The court found generally against the plaintiffs and in favor of the defendant and dismissed plaintiffs' petition.

There is no substantial dispute as to the facts in this case. The plaintiff Reid purchased a new 1975 Lincoln Continental automobile in the fall of 1974 in Scottsbluff, Nebraska. Approximately a year later Reid decided to sell the automobile. He believed the Denver area might be the best market for the automobile and arranged with Arthur Jay, an experienced automobile salesman in Denver, Colorado, and the father of one of Reid's employees, to advertise the automobile and show it to potential buyers. The automobile was driven to Colorado and delivered to Jay in September of 1975. The certificate of title remained in Nebraska.

In early October 1975, Jay advised Reid that a potential buyer, F. Jerrold McMillon, had offered $10,200 for the automobile, a price which was acceptable to Reid. On October 10, 1975, Reid went to his bank in Lyman, Nebraska, which held a lien on the title and arranged to have the lien discharged. Reid then signed the certificate of title in blank and mailed it to Jay. On October 14, 1975, Jay took the automobile and the title to McMillon's place of business, Discount-Rent-A-Mini-Car. Jay delivered the automobile to McMillon in exchange for a Discount-Rent-A-Mini-Car printed business check for $10,200 signed by McMillon. Jay then forwarded the check to Reid, who deposited the check in his bank in Lyman, Nebraska. Later the check was returned marked "Insufficient funds." After some telephone

conversations, the check was sent through once more and this time returned marked "Account closed." Reid was advised of the return by his bank on November 3, 1975. McMillon again assured Reid that he would make the check good, and on November 5, 1975, McMillon sent a second Discount-Rent-A-Mini-Car business check drawn on a different Denver bank in the sum of $10,200. That check was also deposited in Reid's bank in Lyman, Nebraska, and returned unpaid by the Denver bank for "Insufficient funds" on November 17, 1975. Neither check was ever paid.

On October 14, 1975, McMillon obtained the automobile and title in exchange for his check. Sometime between that date and October 20, 1975, McMillon delivered the car and the title to a Denver used car dealer. The title was the original Nebraska title signed by Reid in blank, and McMillon's name did not appear on it. On October 20, 1975, that used car dealer transferred the car and title to a second dealer, and on the same day the second dealer sold the car to a retail buyer, who applied for and obtained a Colorado certificate of title.

On January 2, 1976, Reid made claim against the defendant insurance company under the policy coverage for a loss caused by theft or larceny. The defendant denied coverage and this action followed. The District Court found in favor of the defendant and dismissed the plaintiffs' petition.

Two provisions of the insurance policy are relevant here. The policy provided that the defendant would pay for any loss "caused by theft or larceny." Neither of the two words is defined in the policy. The exclusion provisions of the policy provide that the insurance did not apply "(g) under the Comprehensive and Theft coverages, to loss or damage due to conversion, embezzlement or secretion by any person in possession of a covered automobile under

a bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance."

The District Court found that the loss was not covered by the policy of insurance and that exclusion (g) specifically excluded the loss.

The critical issue on this appeal is whether the loss here was caused by a theft or larceny within the meaning of this insurance policy. Reid contends that the term "theft" in the insurance policy should be broadly defined to include any unlawful or wrongful appropriation of property. The defendant insurance company contends that the term "theft" should be restricted to its common law definition or interpreted to exclude a case in which the insured voluntarily parted with title and possession of the automobile, even though induced to do so by fraud, false pretenses, misrepresentation, or deception.

We examine the insurance policy in the light of two basic rules of interpretation. An insurance policy should be interpreted in accordance with reasonable expectations of the insured at the time of the contract. A contract of insurance should be given a reasonable construction so as to effectuate the purpose for which it was made. In cases of doubt, it is to be liberally construed in favor of the insured. Neal v. St. Paul Fire & Marine Ins. Co., 197 Neb. 718, 250 N. W. 2d 648.

There is no definition of either theft or larceny in the policy itself, but a reading of the policy provisions makes it clear that the term "theft" is much broader in meaning than common law larceny. In Raff v. Farm Bureau Ins. Co., 181 Neb. 444, 149 N. W. 2d 52, this court said: "In popular usage, the word 'theft' is another name for 'larceny.' As a general rule, however, the term as used in an insurance policy is not necessarily synonymous with larceny, but may have a much broader and more inclusive meaning. It could cover pilferage, swindling,

embezzlement, conversion, and other unlawful appropriations as well as larceny."

The defendant obviously considered the term "theft" to be much broader than larceny because it specifically excluded from the theft coverage of the policy "loss or damage due to conversion, embezzlement or secretion by any person in possession of a covered automobile under a bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance." In an insurance policy an exclusion is a provision which eliminates coverage where, were it not for the exclusion, coverage would have existed. See Kansas-Nebraska Nat. Gas Co., Inc. v. Hawkeye-Security Ins. Co., 195 Neb. 658, 240 N. W. 2d 28. The explicit exclusion of those enumerated acts, none of which would have been larceny at common law, indicates that the term "theft" was used in a broad sense. Except for cases where insurance policies specifically exclude coverage where there was a voluntary parting with title and possession, most courts have concluded in recent years that an insured who is fraudulently and wrongfully induced to accept a worthless check in exchange for his automobile has suffered a loss due to theft. See, Munchick v. Fidelity & Cas. Co. of New York, 2 Ohio 2d 303, 209 N. E. 2d 167; Rudolph v. Home Indemnity Co., 138 N. J. Super. 125, 350 A. 2d 285; Farm Bureau Mut. Ins. Co. v. Carr, 215 Kan. 591, 528 P. 2d 134.

This court has denied recovery for theft under automobile insurance policies which specifically excluded losses where the owner "voluntarily parted with title to or possession of any automobile" covered by the policy. Implicit in those holdings is the conclusion that but for the policy exclusion in those cases, the losses would have been covered under the theft provisions of the policies. Rolfsmeier v. Implement Dealers Mut. Ins. Co., 182 Neb. 150, 153 N. W. 2d 367; Boyd v. Travelers Fire Ins. Co., 147 Neb. 237, 22 N. W. 2d 700.

It should be noted also that the insurance policy involved here provided multiple coverages in separate sections. Under the general personal property section of the policy, which did not cover automobiles, the policy specifically excluded from theft coverage any loss caused by "voluntary parting with title or possession of any property by the insured or others to whom the property may be entrusted if induced to do so by any fraudulent scheme, trick, device, or false pretense." No such exclusion is contained in the policy section which provides automobile theft coverage. Instead, that section provides that none of the provisions of other parts of the policy should apply to the automobile coverage except specified clauses which have no application here.

While not directly applicable because it is not operative until July 1, 1978, it is relevant to note that the recently adopted Nebraska Criminal Code provides that conduct denominated "theft" in nine specific sections of the statutes constitutes a single offense embracing the separate offenses heretofore known as larceny, embezzlement, false pretense, extortion, blackmail, fraudulent conversion, receiving stolen property, and the like. See § 28-510, R. S. Supp., 1977.

The critical issue in this case concerns the intent of McMillon at the time he took the title and automobile in exchange for his check. Automobile theft insurance is uniformly viewed as furnishing protection only against losses arising from criminal takings of the insured vehicle and there is apparently no judicial dissent from that proposition. See Annotation, 48 A. L. R. 2d 8, § 9, p. 21. There can be no recovery under such a policy for a loss asserted to amount to a theft in the absence of proof of the existence of a criminal intent on the part of the taker. See, Annotation, 48 A. L. R. 2d 8; Nelson v. National Auto. Ins. Co., 113 Neb. 553, 204 N. W. 55.

Most courts have also taken the view that the fe-

lonious or criminal intent, proof of which is necessary to support a judgment for the insured under an automobile theft policy, must be shown to have been at the time of the taking. See, cases cited in Annotation, 48 A. L. R. 2d, § 10 p. 28; Nelson v. National Auto. Ins. Co., *supra*.

We hold that in an automobile insurance policy providing coverage against theft, in which the term is not defined, the term "theft" will be construed broadly to include a loss caused by any unlawful or wrongful taking of the insured vehicle with criminal intent.

The insurance company contends, and the District Court found, that exclusion (g) specifically excluded the loss here. That exclusion was: "This insurance does not apply: * * * (g) under the Comprehensive and Theft coverages, to loss or damage due to conversion, embezzlement or secretion by any person in possession of a covered automobile under a bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance." That exclusion is clearly not applicable here. The transaction with McMillon was complete upon the contemporaneous exchange of his check for title and possession of the car. The exclusion clause is aimed at persons in possession under executory contracts and agreements in which two or more persons have concurrent legal interests in a car and not at a buyer in a completed sale. See, Farm Bureau Mut. Ins. Co. v. Carr, *supra*; Great American Ins. Co. v. Gusman, 80 Ga. App. 471, 56 S. E. 2d 319.

Since the trial court erroneously determined that exclusion clause (g) was applicable, the court did not consider or make any finding as to McMillon's criminal intent or lack of it at the time he took title and possession of the car in exchange for his check. The plaintiff must establish the existence of McMillon's criminal intent by a preponderance of the evidence only and not beyond a reasonable doubt. See

Annotation, 48 A. L. R. 2d, § 14, p. 51. The fact that the buyer of an automobile issues and delivers an insufficient funds check in payment of the purchase price does not of itself establish criminal intent in a case such as this. On the evidence in this case, however, the fact finder could reasonably have found either that there was, or that there was not, the requisite criminal intent at the time of the taking. That issue cannot be determined as a matter of law and the judgment must, therefore, be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.